FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

DEC 18 2013

D. MARK JONES, CLERK
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ROSARIO WILFREDO CASTRO-CARBAJAL and PEDRO GONZALES-ZAVALA, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:12-CR-715-DB <br><br> Judge Dee Benson |

This matter is before the court on defendant Pedro Gonzales-Zavala's ("Gonzales") and defendant Rosario Wilfredo Castro-Carbajal's ("Castro") motion to suppress. (Dkt. Nos. 20, 25.) On February 28, 2013, the court conducted an evidentiary hearing on the motion. At the conclusion of the hearing, the court ordered a transcript and supplemental briefing from the parties. Thereafter, on August 15, 2013, the court held a second hearing on the motion.

Following the second hearing, the court ordered a transcript and set a briefing schedule. On November 26, 2013, the court held a third hearing on the motion, during which a Stipulation of Additional Facts was received. After thorough review and consideration of the pleadings submitted by the parties and the testimony presented at all of the evidentiary hearings on the motions to suppress, the court enters the following Memorandum Decision and Order.

## BACKGROUND

The court finds the relevant facts as follows.[1] In August, 2012, Agent Scott Spieth, of the Utah County Major Crimes Task Force ("Task Force"), was investigating a drug trafficking group in West Valley City, Utah. (Tr. I at 6.) During the investigation, Agent Spieth discovered heroin hidden inside the soles of a pair of shoes. (Tr. I at 17:4-7.) Interviews taken with a confidential informant as part of that investigation revealed that Castro was responsible for coordinating and distributing large quantity narcotics shipments. (Tr. I at 7-8.) Task Force agents also learned from the confidential informant that Castro had ties to a Mexican drug cartel and that the confidential informant expressed a fear of retaliation against himself or his family for working with the agents. (Tr. II at 12-13, 16-17.) The interviews also yielded the license plate number for Castro's vehicle. (Tr. I at 7.)

Agent Spieth and other agents on the Task Force subsequently began investigating Castro. Under the direction of Agent Spieth, the confidential informant exchanged text messages

---

[1] Reference to the transcript of the evidentiary hearing conducted on February 28, 2013, will be cited as "Tr. I at __." Reference to the transcript of the evidentiary hearing conducted on August 15, 2013, will be cited as "Tr. II at __." Reference to the Stipulation of Additional Facts received at the hearing on November 26, 2013, will be cited as "Stip. at __."

and engaged in phone calls with Castro. (Tr. I at 9.) These communications involved negotiating the purchase of heroin. (Tr. I at 10.) Based on these communications, Task Force agents believed that Castro was expecting to receive a shipment of heroin. (Tr. I at 10.) Accordingly, on October 9, 2013, Agent Spieth and other Task Force agents conducted visual surveillance of Castro's vehicle. (Tr. I at 11.) After conducting such surveillance for 23 to 30 hours, the Task Force agents followed the vehicle to a Greyhound bus station in Salt Lake City. (Tr. I at 11.)

Agent Spieth testified that, based on his experience, narcotics traffickers often utilize the Greyhound bus system to transport narcotics into Utah. (Tr. I at 8-9.) Traffickers would arrive from other states, make a quick exchange of narcotics and then promptly depart on an outbound bus. (Tr. I at 8-9.)

While observing Castro at the bus station, Task Force agents watched a man, later identified to be defendant Gonzales, carry a black backpack out of the bus station and enter the passenger side of Castro's truck. (Tr. I at 12.) Gonzales's backpack did not appear overly full, and he did not carry any other luggage. (Tr. I at 12.)

Shortly after Castro and Gonzales drove away from the bus station, they were pulled over by the Task Force agents. (Tr. I at 13.) The agents used what is referred to as the "box-in" technique, whereby one unmarked law enforcement vehicle maneuvered to the left of Castro's truck while other vehicles were positioned directly in front of and behind the truck. (Tr. I at 12.) When the agents in the vehicle behind the truck initiated their lights, all three law enforcement vehicles stopped in unison, thereby preventing Castro and Gonzales from fleeing. (Tr. I at 12.)

Five to seven agents surrounded Castro's truck, three to five of them with their guns

3

drawn, and ordered Castro and Gonzales to exit the truck. (Tr. I at 25; Tr. II at 12, 18.) After Castro and Gonzales exited the vehicle, the agents holstered their guns. (Stip. at 1.) Gonzales was handcuffed, placed in a patrol car, and immediately read his *Miranda* rights. (Tr. I at 14, 23.) Castro was lead to the side of the road where he was Mirandized and told that he was not free to leave, but remained free of handcuffs. (Stip. at 1.) While Agent Spieth questioned Gonzales, Sergeant Theron Leany interviewed Castro. (Tr. I at 19-20; Stip. at 1-2.) During questioning, Gonzales stated that he had come from Arizona to pick-up money from Castro, but later changed his story and said that he had come to meet Castro because Castro was going to help him find a job. (Tr. I at 16-17.) At some point after being Mirandized, Castro made inculpatory statements and consented to a search of his bedroom, where a firearm was later found. (Stip. at 2.)

Within ten minutes of the stop a police K-9 unit arrived at the scene. (Tr. I at 23.) The canine indicated the presence of narcotics inside the vehicle, as well as inside Gonzales's backpack. (Tr. I at 27.) After Task Force agents failed to find narcotics inside either the vehicle or backpack, Agent Spieth immediately asked Gonzales if he could examine Gonzales's shoes. (Tr. I at 34.) Upon examining the shoes, Agent Spieth discovered approximately 2.8 pounds of heroin hidden inside the soles. (Tr. I at 18.)

Agent Spieth testified that the stop was based on the totality of the investigation. (Tr. I at 13.) Agent Spieth further testified that, based on what he had learned through his experience in investigating narcotics, he was confident that the individual that Castro picked up was likely transporting narcotics. (Tr. I at 13.)

4

## DISCUSSION

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches and seizures by government actors. *See* U.S. Const. amend. IV; *United States v. Sanchez*, 89 F.3d 715, 717 (10th Cir. 1996). "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995). The reasonableness of an investigative stop is reviewed under the two-part test set forth in *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Under that test, the court must make a dual inquiry asking first, whether the officer's action was justified at its inception and second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Id.*; *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002).

Castro and Gonzales contend that the Task Force agents did not have reasonable suspicion to initially stop the vehicle. (Def. Castro's Reply in Supp. at 1.) Castro and Gonzales further insist that even if reasonable suspicion existed to justify stopping and searching the vehicle, the Task Force agents' actions escalated the encounter into an arrest conducted without probable cause. (Def. Castro's Reply in Supp. at 3, 6.) Finally, Castro and Gonzales argue that their illegal arrest tainted any subsequent consent such that the consent must be held to be invalid. (Def. Gonzales's Mem. in Supp. at 2.) The court addresses each of these items in turn. Prior to beginning this analysis, the court recognizes that this case is remarkably similar to *United States v. Melendez-Garcia*, and therefore the court is bound by that precedent. 28 F.3d 1046 (10th Cir. 1994).

## I. The Initial Stop Was Justified at Its Inception

When making a *Terry* stop, the Fourth Amendment requires only "a *minimum* level of objective justification which is *considerably* less than proof of wrongdoing by a preponderance of the evidence." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (citation omitted) (emphasis added). The facts in this case are clearly sufficient to meet this standard.

Prior to stopping the vehicle, Agent Spieth had conducted a narcotics trafficking investigation focused on Castro. A confidential informant specifically named Castro as his narcotics distributor and was able to provide Agent Spieth with the license plate number to Castro's truck. Subsequently, the informant negotiated the purchase of heroin from Castro via phone calls and text messages. These communications led Task Force agents to believe Castro was soon to receive a shipment of heroin. Accordingly, the agents placed Castro's truck under surveillance. The truck was watched for approximately 23-30 hours before Castro drove to the bus station. Agent Spieth testified that, based on his experience, narcotics traffickers often utilize the Greyhound bus system to transport narcotics into Utah. Traffickers would arrive from other states, make a quick exchange of narcotics and then promptly depart on an outbound bus. Once at the Greyhound station, Castro picked up Gonzales who carried nothing but a backpack.

Based on the foregoing, the agents had enough objective reasons for suspicion to support their decision to pull over the truck. In the words of *Terry*, the agents' stop was "justified at its inception." *Terry*, 392 U.S. at 20.

## II. The Investigatory Detention Escalated to an Illegal Arrest.

Once police officers make a stop based on reasonable suspicion, the scope of that stop

must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *United States v. King*, 990 F.2d 1552, 1562 (10th Cir. 1993). However, police officers are not required to take unnecessary risks in performing their duties. *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993). Instead, they are allowed to take the steps reasonably necessary to protect their personal safety during the course of a *Terry* stop. *Id.*

"The government has the burden of demonstrating that the seizure 'it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983)). There is no bright-line rule in making this determination. *King*, 990 F.2d at 1562. Instead courts evaluate police conduct using common sense and ordinary human experience. *Id.* To avoid impractical second-guessing of police officers' decisions in this regard, we do not require them to use the least intrusive means in the course of a detention, only reasonable ones. *Id.* at 1562-63.

The Supreme Court has long allowed de minimus intrusions on the liberty of a person detained by a *Terry* stop to advance officer safety, such as a frisk for weapons or a request to step out of the car during a traffic stop. *Terry*, 392 U.S. at 27. However, the much greater level of intrusion imposed by the use of handcuffs and firearms requires the government to demonstrate that "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *King*, 990 F.2d at 1562 (quoting *Terry*, 392 U.S. at 21-22).

The Tenth Circuit has held that the use of firearms, handcuffs, and other forceful

7

techniques does not necessarily transform a *Terry* detention into a full custodial arrest when "the circumstances reasonably warrant such measures." *Perdue*, 8 F.3d at 1463-64.[2] "[T]he use of guns in connection with a stop is permissible where the police reasonably believe they are necessary for their protection." *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982). In contrast, when sufficient evidence does not exist to support an objective belief that guns are necessary to ensure officer safety, the Tenth Circuit refuses to consider the use of guns a reasonable exercise of precaution and considers such a stop an arrest. *See. United States v. Melendez-Garcia*, 28 F.3d 1046, 1051-53 (10th Cir. 1994); *United States v. King*, 990 F.2d 1552, 1563 (10th Cir. 1993).

In this case, the government does not specifically explain why the force used on Gonzales and Castro was reasonable. Agent Spieth made general statements that he understood the defendants to have ties to a Mexican drug cartel, and that the confidential informant feared retaliation against his or her family, who live in Mexico. However, Agent Spieth gave no specific reasons why the circumstances of the stop reasonably necessitated the display of firearms and the use of handcuffs. In fact, Agent Spieth testified that at no point during their surveillance of Castro did they see him with a gun or any other weapon. (Tr. II at 27.) Agent Spieth further

---

[2] *Compare United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (finding officers acted reasonably by ordering suspects out of car at gunpoint and forcing them to lie on the ground when police had information that the suspects might be armed, it was late at night in a remote area, and there were only two officers) *and United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) (holding use of firearms and handcuffs was reasonable when officers were informed suspect had threatened to kill someone and they observed the suspect violently pounding his fists in his truck) *with United States v. King*, 990 F.2d 1552, 1563 (10th Cir. 1993) (finding officer acted unreasonably when she drew her gun and had other officers handcuff the defendant when she noticed that the defendant, who was only creating a traffic disturbance by honking his horn, lawfully had a weapon in the car).

8

admitted that the informant never indicated that Castro was armed and/or dangerous. (Tr. II at 27.)

The court is aware that "drugs and guns and violence often go together." *Melendez-Garcia*, 28 F.3d at 1052. However, there was no specific evidence or testimony regarding why the agents had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of drawing their weapons or using handcuffs during the *Terry* stop. As the Tenth Circuit has made clear, "[i]n the absence of such evidence, the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop." *Melendez-Garcia*, 28 F.3d at 1052-53. (citations omitted).

In this case, agents used a cumulatively high level of force during the investigatory stop. Five to seven agents surrounded the defendants, three to five of them with their guns drawn, and ordered defendants out of the truck. Gonzales was immediately handcuffed, placed in a police car, and Mirandized, while Castro was Mirandized and informed that he was not free to leave, on the side of the road.

The government's position that such force was necessary because the suspects had ties to Mexico and a confidential informant feared for his or her safety is not persuasive. The officers outnumbered the defendants, the stop was made during the day, the agents did not have any tips suggesting that the defendants were armed or dangerous, and the defendants complied with police orders. The government has failed to meet its burden of showing that, under the totality of the circumstances, the use of firearms and the interrogation of Gonzales while handcuffed in the back of a police car were reasonably necessary for officer safety.

Because the specific nature of this stop was not justified under the *Terry* doctrine, we must treat it as an arrest, requiring probable cause. The government makes no effort to argue that it had probable cause to make an arrest at the time the officers initially stopped the defendants or at any point prior to the discovery of heroin in Gonzales's shoes. Indeed, no such argument could be made on this record. Thus, the court must conclude that Castro and Gonzales were illegally arrested.

### III. The Illegal Arrests Tainted the Defendants' Consent to Search.

Having found the defendants to have been illegally arrested, the court now turns to whether the unlawful seizure rendered Gonzales's consent to search his shoes and Castro's consent to search his home, invalid, and the subsequently discovered evidence inadmissible. *See Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

Though voluntary consent may be given by a person who is illegally detained, the government faces a heavy burden in showing that the primary taint of the illegal stop was purged so that the subsequent consent was voluntary in fact. *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir. 1994). To carry this burden "the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent." *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996) (quotation omitted). In *Brown v. Illinois*, the Supreme Court articulated three factors especially relevant to this inquiry: (1) the temporal proximity between the police illegality and the consent to search; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04.

10

Beginning with the first factor, a close temporal proximity weighs against a finding of attenuation. *See United States v. Ward*, 961 F.2d 1526, 1534 (10th Cir. 1992) (consent not voluntary where "only minutes" passed after illegal seizure); *United States v. Maez*, 872 F.2d 1444, 1455, 1456 (10th Cir. 1989) (taint of illegal arrest not purged where consent form signed thirty minutes after illegal arrest); *United States v. Recalde,* 761 F.2d 1448, 1459 (10th Cir. 1985) (no voluntary consent where only "several minutes" elapsed between illegal detention and signing of consent form).

In this case, only a few minutes passed between the defendants' illegal arrest and their subsequent consent to search. The K-9 unit arrived within ten minutes of the stop, and Castro was questioned contemporaneously with the canine's arrival and search of the vehicle. (Tr. I at 26, 28, 29.) Gonzales was questioned about his shoes "immediately" after agents had completed their search of the vehicle and backpack. (Tr. I at 26, 28, 34.) Accordingly, the court finds this factor favors the defendants.

In weighing the second *Brown* factor, the court looks to "whether any intervening event occurred which isolates the defendant from the coercive effects of the original illegal stop so as to render his subsequent consent voluntary in fact." *United States v. Gregory*, 79 F.3d at 980. Some examples of intervening circumstances include: carefully explaining a consent form and advising an individual of the right to withhold consent, *United States v. Mendoza-Salgado*, 964 F.2d 993, 1012, 1016 (10th Cir. 1992), releasing the individual from custody, or allowing the individual to consult with an attorney. *United States v. Washington*, 387 F.3d 1060, 1074 (9th Cir. 2004). Though *Miranda* warnings are relevant to this inquiry, they do not per se break the causal connection between the illegality and evidence obtained by exploitation of an illegal

11

arrest. *Recalde*, 761 F.2d at 1458 (10th Cir. 1985). As the Supreme Court noted in *Brown*:

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. *See Davis v. Mississippi*, 394 U.S. 721, 726-727, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969). Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' *See Mapp v. Ohio*, 367 U.S., [643], at 648 [81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961)]."

*Brown* at 602-03 (footnote omitted).

Here, it is undisputed that both defendants were read their *Miranda* rights. However, there were no other intervening circumstances between the illegal arrest and the consent to search. Castro was told that he was being detained and that he was not free to leave and Gonzales remained handcuffed inside a police vehicle for the duration of the encounter, including when asked by Agent Spieth for consent to search his shoes. Therefore, the court also finds that this factor favors the defendants.

With respect to the purpose and flagrancy of the violation, the final *Brown* factor, it cannot be said that the Task Force agents purposefully conducted an illegal arrest, as was the case in *Brown*. *See Brown*, 422 U.S. at 605. However, the agents did use multiple law enforcement vehicles to "box-in" Castro's truck, several agents had their guns drawn when demanding that the defendants exit the truck, and Gonzales was handcuffed in a police car for the entire encounter. Despite the agents' expressed concern about pulling over suspected drug traffickers with ties to Mexico, the agents had no *specific* reason to believe that the defendants were armed, violent, or

posed a threat to officer safety. The agents' display of such force in conducting an arrest without probable cause, was sufficient to taint Castro's consent to search his bedroom and Gonzales's consent to search his shoes.

Having found each of the *Brown* factors in the defendants' favor, the court finds that the illegal arrest tainted the subsequent consent given by the defendants.

## CONCLUSION

Having determined that the encounters between Agent Spieth and Gonzales, and between Sgt. Leany and Castro, escalated to an illegal arrest without probable cause, and having further determined that the illegal arrest tainted Castro's and Gonzales's consent, the defendants' Motions to Suppress are GRANTED.

IT IS SO ORDERED.

DATED this 13th day of December, 2013.

BY THE COURT:

HONORABLE DEE BENSON

United States District Court Judge